IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                        Cr. No.  09-1750 JH

DAVID EUGENE BIRDSALL,

        Defendant.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant's *Motion to Suppress Evidence and Fruit of Poisoned Tree*, filed October 30, 2009 [Doc. 27]. The Court held a hearing on this motion on January 27, 2010 and February 5, 2010. The Court, having carefully considered the motion, relevant law, testimony at the hearing, and evidence admitted at the hearing, and being otherwise fully informed, finds that Defendant's motion to suppress is not well taken and should be DENIED.

## BACKGROUND

Based on testimony adduced at the suppression hearing, the Court finds the facts surrounding Defendant's detention and arrest to be as follows. At the time in question, Herman Dunn managed the Big O Tires store in Los Lunas, New Mexico. On December 2, 2008, at approximately 12:15 p.m., Mr. Dunn contacted the Los Lunas Police Department ("LLPD") to notify them that a disgruntled ex-employee was likely on his way to the store to pick up equipment that the ex-employee claimed was his, and that he had told Mr. Dunn that he would be armed. Mr. Dunn told the LLPD dispatcher that the ex-employee was Defendant David Birdsall, and that he knew that Mr. Birdsall owned at least two guns. In sending out the call to

officers to go to Big O Tires, the dispatcher also described the vehicle that defendant was likely driving as an old, white Chevy Suburban. LLPD Officers Megan Sanchez and Mark Torres, as well as Sergeant Robert Ferreyra, all responded to the call and arrived at Big O Tires within minutes of the dispatch.

Once at the store, Officer Sanchez interviewed Mr. Dunn, as well as Mr. Dunn's daughter, who also worked at the store. Mr. Dunn told Officer Sanchez that Mr. Birdsall was his brother-in-law, that Mr. Birdsall is an angry person and might be violent, and that Mr. Birdsall had been incarcerated in Colorado. He also identified the guns Mr. Birdsall might be carrying as a shotgun and a 9mm handgun. In addition, he relayed the contents of a screaming and profanity-laced telephone call that Mr. Birdsall had made to Mr. Dunn's daughter several minutes earlier, which the daughter confirmed, in which he threatened "to kill that f***ing Mexican." Mr. Birdsall's threat apparently related to the owner of the Big O Tire store, Steve Hernandez, who was not present at the time. Because of this threat, Mr. Dunn locked all of the doors to the store and gathered all of his workers together in a safe place just prior to calling the LLPD. Mr. Dunn and the other people that Officer Sanchez interviewed appeared to her and Sergeant Ferreyra to be extremely frightened by the potential that Mr. Birdsall might show up.

While Officer Sanchez was interviewing Mr. Dunn, Mr. Dunn's son, who also worked in the store, came in and told her that Mr. Birdsall had recently departed a residence and had just been seen driving on a ditch bank near the Valencia County Magistrate Courthouse. An officer relayed this information to dispatch, and other officers responded to that area, followed quickly by Officer Sanchez and Sergeant Ferreyra. The first officers on the scene were Lieutenant Max Blea and Officer Jesus Sedillos, who arrived separately but at essentially the same time. The vehicle that they encountered on the ditch bank was an old, white Chevy Suburban, just as had

2

been described to them. At the time they encountered this vehicle, the officers knew from dispatch that the driver was named David Birdsall, that he was disgruntled and likely armed with a 9mm handgun and a shotgun, and that he had threatened to show up in that mode at the Big O Tires store. Lieutenant Blea first made contact with Defendant, who identified himself as David Birdsall. Lieutenant Blea relayed the information from Defendant's identification to the dispatch operator, who ran an inquiry on Defendant.

Meanwhile, while Lieutenant Blea was speaking with Defendant near his police vehicle, Officer Sedillos approached the Suburban to see if it contained any of the weapons that had been described by dispatch. Without opening any doors or windows, Officer Sedillos saw, in plain view, a handgun lying on the front middle seat and a shotgun in the rear seat on the floorboard. Once he saw the guns, Officer Sedillos opened the passenger door, removed the weapons, and disarmed them. Officer Sedillos testified that he disarmed the weapons, pursuant to his training and the policies and procedures of the LLPD, in order to ensure the safety of officers on the scene, as Defendant was not, at this point, handcuffed or otherwise incapacitated, though he was away from his vehicle. Once he disarmed the weapons, he ran a query of the firearms' serial numbers to determine whether they were stolen. In addition, officers ran a check on the Suburban's licence plate. While these queries were being run, dispatch informed the officers that Defendant had a restraining order against him in Colorado. Officers then asked dispatch to run a "Triple I," which is a report that compiles a subject's nationwide criminal history. Dispatch then reported that, although the handgun initially appeared in the department's local computer as stolen, the national database confirmed that the initial match of the gun as stolen was incorrect and that the handgun was not, in fact, stolen. Dispatch also reported that the Suburban had an expired registration and that the license plate attached to it was not the plate

under which it was registered. Finally, dispatch notified the officers that Defendant was a convicted felon.

During the time that Lieutenant Blea was interviewing Defendant and requesting that various information be run through the computers by dispatch and Officer Sedillos was retrieving and disarming the weapons in the Suburban, Officer Sanchez and Sergeant Ferreyra arrived at the ditch bank. At the time Officer Sanchez and Sergeant Ferreyra arrived, Officer Sedillos informed them that he had found the two weapons in the Suburban. Officer Sanchez patted down Defendant, handcuffed him, and placed him in her vehicle. She then read him his Miranda rights, and placed him under arrest. Officer Sanchez testified that the basis for Defendant's arrest was that he was a felon in possession of a firearm and that she did not place him under arrest until she found out for sure that he was a felon. Ultimately, Officer Sanchez filed a complaint charging Defendant with being a felon in possession of a firearm, driving without insurance, and driving an unregistered vehicle.

On October 30, 2009, Defendant filed a motion to suppress "any and all evidence seized from [Defendant's] vehicle, person and effects" as well as any post-arrest statements by Defendant. Doc. 27 at 1-2. Defendant's motion is premised on his claim that the officers lacked the reasonable suspicion to support Defendant's warrantless seizure and that they lacked probable cause to seize the firearms and ammunition from Defendant's vehicle without a warrant.

## **DISCUSSION**

A. Reasonable Suspicion for Seizure of Defendant

For Fourth Amendment purposes, the Supreme Court has identified three categories of encounters between police and citizens: (1) consensual encounters, which are not considered

seizures, and which therefore need not be supported by suspicion of any criminal wrongdoing; (2) investigative stops, in which an officer may briefly detain a person for investigative purposes if the officer has a reasonable suspicion of criminal activity, supported by articulable facts; and (3) arrests, which are only justified if the officer has probable cause to believe that the arrestee has committed a crime. *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000).

The Government does not contest that, the moment officers stopped Defendant's Suburban and ordered him out of his vehicle, the encounter became an investigative detention. *See* Government's Response [Doc. 40] at 5. In order to determine whether an investigative detention was reasonable, the Court must first ask whether the stop was justified at its inception, and then determine whether the detention was "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 2005) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). At both stages, the Court judges the reasonableness of the officer's suspicions by an objective standard, taking the totality of circumstances and information available to the officer into account. *United States v. Johnson*, 364 F.3d 1185, 1189 (10th Cir. 2004). Suspicion must derive from more than an "inchoate and unparticularized suspicion or 'hunch'" by officers. *See Terry*, 392 U.S. at 27. However, reasonable suspicion represents a "minimal level of objective justification" which is "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Moreover, the Court must not engage in "unrealistic second-guessing of police officers' decisions," but instead must "accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. Villa-Chaparro*, 115 F.3d 797, 801 (10th Cir. 1997).

In this case, the officers' suspicions that Defendant may have been involved in criminal

activity was entirely reasonable and more than a mere unparticularized suspicion. The officers who initially detained Defendant had information that he was armed and disgruntled, and that he had stated his intention to go to his former employer's place of business to pick up what he considered to be his belongings while so armed. These officers also had Defendant's name, a description of the vehicle he was driving, and his location. It was reasonable for the officers to detain Defendant to investigate the validity of the tips they had received, in light of the potential for serious violence to occur.

     Defendant argues that the tip was the only reason that the LLPD officers had any reason to suspect any illegal activity because there was nothing criminal, based on what officers knew at the time, about Defendant possessing firearms in his vehicle. *See* Defendant's Memorandum [Doc. 28] at 5. This argument is unavailing. First, the information that the police had came not from an anonymous tipster giving "overly generic" information. *United States v. Johnson,* 364 F.3d 1185, 1191 (10th Cir. 2004). Instead, Mr. Dunn identified himself when he called to report his concerns, and he provided the police with very specific information about Defendant, including the type of vehicle he was driving and the type of weapons he had in the vehicle. This distinguishes this case from *Florida v. J.L.*, 529 U.S. 266 (2000), cited by Defendant, in which the Supreme Court found that an anonymous tip that a young black male wearing a plaid shirt at a bus stop was carrying a gun did not create reasonable suspicion to enable officers to conduct an investigative stop. In this case, not only did Mr. Dunn identify himself to the dispatcher, but he soon spoke with police face-to face, giving them even more details. This in-person conversation with officers gave the police an opportunity to evaluate his credibility and demeanor. *See United States v. Sanchez*, 519 F.3d 1208, 1213 (10th Cir. 2008). Additionally, by providing his identity and speaking with police directly, Mr. Dunn added to the reliability of his tip because of the risk

6

that he could be liable if his allegations turned out to be fabricated.  *See United States v. Jenkins*, 313 F.3d 549, 554 (10th Cir. 2002).  Finally, the level of detail given by Mr. Dunn alleviated the concern that an overly general tip "could give police excessive discretion to stop and search large numbers of citizens."  *Johnson*, 364 F.3d at 1191.  The reliability of Mr. Dunn's tip was further confirmed when officers spotted Defendant driving the described vehicle in the described location.  The totality of the circumstances in this case gave the officers a "particularized and objective basis for suspecting the particular person stopped of criminal activity."  *Sanchez*, 519 F.3d at 1213 (citations omitted).  Further, the scope of Defendant's detention was reasonably related to the circumstances that justified the stop in the first place.  The officers were justified in detaining Defendant while they ran background checks on him and his vehicle, especially in light of the basis for the stop and the fact that they saw weapons in plain sight.

    B.  Seizure of the Weapons

Defendant argues that the officers had no probable cause to seize the weapons from his vehicle while they conducted an investigative detention.  The Government argues that the officers conducted a valid warrantless plain view seizure.  To justify a warrantless seizure under the plain view doctrine, (1) the seizing agent must not have violated the Fourth Amendment in arriving at the place from which the evidence could plainly be seen; (2) not only must the item be in plain sight, "but its incriminating character must be immediately apparent"; and (3) the officer must have a lawful right of access to the place where the object is located.  *United States v. Naugle*, 997 F.2d 819, 822 (10th Cir.), *cert. denied*, 510 U.S. 997 (1993).  As discussed previously, the officers lawfully performed an investigative detention of Defendant, which properly put Officer Sedillos in the position to see the guns which were in plain view inside the Suburban.  In its brief, the Government contends that the incriminating nature of the firearms was immediately known to

the officers because they knew that Defendant was a convicted felon who was therefore forbidden to possess firearms.  *See* Government's Response [Doc. 40] at 11.  However, the testimony adduced at the hearing, and the dispatch tape entered into evidence as Government Ex. 6A, do not bear out this contention.  Officer Sedillos testified that, immediately upon arriving on the scene, while Defendant's identifying information was still being run through police computers by dispatch, he approached the Suburban, saw the weapons, and removed them.  At this point, no information had come over dispatch that Defendant was a convicted felon.  Neither had information come out yet that Defendant had "done some time" in Colorado as Mr. Dunn told officers at Big O Tires or that he had a restraining order against him in Colorado, either of which might have provided sufficient information to make the presence of firearms incriminating.  At the point Officer Sedillos took the guns from the Suburban and disarmed them, he had no information about Defendant other than a tip that he was disgruntled, armed, and potentially on his way to his former place of employment.

In its brief, the Government relied almost exclusively on its contention that Officer Sedillos knew that Defendant was a convicted felon at the time he seized the weapons.  However, the Government also superficially raised the contentions that knowledge that Defendant was disgruntled, armed and potentially on his way to Big O Tires was sufficient to enable a warrantless seizure of the weapons and that considerations of officer safety provided a legally sufficient justification for the seizure and disarming of the weapons, but it did not provide legal argument on these contentions.[1]  The Court need not reach the question of whether either of these

---

[1] The Government's brief also argued that the firearms were lawfully seized during a search incident to arrest, but it is uncontroverted that Defendant was not arrested until significantly after Officer Sedillos seized the weapons, so this argument is unavailing as well.

justifications is sufficient, because the illegality of Defendant's possession of the weapons would inevitably have been discovered irrespective of Officer Sedillos's seizure of the weapons. The inevitable discovery rule permits evidence to be admitted "if an independent, lawful police investigation inevitably would have discovered it." *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir 2005) (quoting *United States v. Owens*, 782 F.2d 146, 152 (10th Cir. 1986)). To fall under this rule, the Government must prove "by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."[2] *Id.*

This case differs from the usual inevitable discovery case in that the evidence itself was already discovered, as it was in plain sight; it was only the illegal nature of the weapons that had yet to be discovered at the time of the seizure. However, the Government has proved that the piece of information that made the weapons plainly incriminating, namely the fact of Defendant's felony conviction, would have been discovered within minutes of the seizure, and would have been discovered independent of the seizure. Officer Sedillos credibly testified that it is common procedure to run a vehicle's license plate and a Triple I check in the course of a traffic stop. In fact, Defendant's personal information was already being run through the police computers even before the seizure. The Triple I check, which took only approximately two minutes to reveal Defendant's felon status, was ordered immediately after the seizure. However, there is no evidence that the officers requested the Triple I check only because the guns had been discovered. Indeed, it is almost inconceivable that an officer would not request a background check on a subject who had made reported threats and who had two weapons in plain sight, completely apart

---

[2] In conducting an inevitable discovery analysis, the Court is not finding that the seizure of the weapons was a Fourth Amendment violation; rather, it is simply holding that it need not reach the Fourth Amendment question.

9

from whether those weapons had already been retrieved, or that they would have allowed Defendant to leave pending completion of the background check. Thus, even if Officer Sedillos unlawfully entered Defendant's vehicle to retrieve and disarm the two weapons sitting in plain sight, the weapons should not be suppressed, and Defendant's subsequent arrest for being a felon in possession of a firearm is valid.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's *Motion to Suppress Evidence and Fruit of Poisoned Tree* [Doc. 27] is DENIED.

*[signature]*

**UNITED STATES DISTRICT JUDGE**